1  EILEEN M. DECKER
   United States Attorney
2  DENNISE D. WILLETT
   Assistant United States Attorney
3  Chief, Santa Ana Branch Office
   JOSHUA M. ROBBINS (Cal. State Bar No. 270553)
4  SCOTT D. TENLEY (Cal. State Bar No. 298911)
   Assistant United States Attorneys
5  ASHWIN JANAKIRAM (Cal. State Bar No. 277513)
   Special Assistant United States Attorney
6      8000 United States Courthouse
7      411 West Fourth Street
       Santa Ana, California 92701
8      Telephone:  (714) 338-3538
       Facsimile:  (714) 338-3708
9      Email: Joshua.Robbins@usdoj.gov

10
   Attorneys for Plaintiff
11 UNITED STATES OF AMERICA

12

13              UNITED STATES DISTRICT COURT

14         FOR THE CENTRAL DISTRICT OF CALIFORNIA

15              SOUTHERN DIVISION

16 UNITED STATES OF AMERICA,        No. SA CR 15-

17              Plaintiff,          PLEA AGREEMENT FOR DEFENDANT
                                    JAMES L. CANEDO
18              v.

19 JAMES L. CANEDO,
                                    [UNDER SEAL]
20              Defendant.

21

22      1.   This constitutes the plea agreement between JAMES L.

23 CANEDO ("defendant") and the United States Attorney's Office for the

24 Central District of California ("the USAO") in the above-captioned

25 case.  This agreement is limited to the USAO and cannot bind any

26 other federal, state, local, or foreign prosecuting, enforcement,

27 administrative, or regulatory authorities.

28 / / /

                              1

### DEFENDANT'S OBLIGATIONS

2.   Defendant agrees to:

a)   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a one-count criminal Information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Conspiracy in violation of 18 U.S.C. § 371.

b)   Not contest facts agreed to in this agreement.

c)   Abide by all agreements regarding sentencing contained in this agreement.

d)   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e)   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f)   Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

g)   Pay the applicable special assessments at or before the time of sentencing unless defendant lacks the ability to pay and prior to sentencing submits a completed financial statement on a form to be provided by the USAO.

3.   Defendant further agrees:

a)   Truthfully to disclose to law enforcement officials, at a date and time to be set by the USAO, the location of, defendant's ownership interest in, and all other information known

2

1   to defendant about, all monies, properties, and/or assets of any

2   kind, derived from or acquired as a result of, or used to facilitate

3   the commission of, defendant's illegal activities, and to forfeit

4   all right, title, and interest in and to such items.

5          b)   To the Court's entry of an order of forfeiture at or

6   before sentencing with respect to these assets and to the forfeiture

7   of the assets.

8          c)   To take whatever steps are necessary to pass to the

9   United States clear title to the assets described above, including,

10  without limitation, the execution of a consent decree of forfeiture

11  and the completing of any other legal documents required for the

12  transfer of title to the United States.

13         d)   Not to contest any administrative forfeiture

14  proceedings or civil judicial proceedings commenced by the United

15  States of America against these properties.

16         e)   Not to assist any other individual in any effort

17  falsely to contest the forfeiture of the assets described above.

18         f)   Not to claim that reasonable cause to seize the

19  assets was lacking.

20         g)   To prevent the transfer, sale, destruction, or loss

21  of any and all assets described above to the extent defendant has

22  the ability to do so.

23         h)   To fill out and deliver to the USAO a completed

24  financial statement listing defendant's assets on a form provided by

25  the USAO.

26     4.   Defendant further agrees to cooperate fully with the USAO,

27  the Federal Bureau of Investigation, the United States Postal

28  Service - Office of Inspector General, the Internal Revenue Service,

1   and, as directed by the USAO, any other federal, state, local, or
2   foreign prosecuting, enforcement, administrative, or regulatory
3   authority.   This cooperation requires defendant to:

4           a)   Respond truthfully and completely to all questions
5   that may be put to defendant, whether in interviews, before a grand
6   jury, or at any trial or other court proceeding.

7           b)   Attend all meetings, grand jury sessions, trials or
8   other proceedings at which defendant's presence is requested by the
9   USAO or compelled by subpoena or court order.

10          c)   Produce voluntarily all documents, records, or other
11  tangible evidence relating to matters about which the USAO, or its
12  designee, inquires.

13      5.   For purposes of this agreement: (1) "Cooperation
14  Information" shall mean any statements made, or documents, records,
15  tangible evidence, or other information provided, by defendant
16  pursuant to defendant's cooperation under this agreement; and
17  (2) "Plea Information" shall mean any statements made by defendant,
18  under oath, at the guilty plea hearing and the agreed to factual
19  basis statement in this agreement.

20                          THE USAO'S OBLIGATIONS

21      6.   The USAO agrees to:

22          a)   Not contest facts agreed to in this agreement.

23          b)   Abide by all agreements regarding sentencing
24  contained in this agreement.

25          c)   At the time of sentencing, provided that defendant
26  demonstrates an acceptance of responsibility for the offense up to
27  and including the time of sentencing, recommend a two-level
28  reduction in the applicable Sentencing Guidelines offense level,

                                    4

1  pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move

2  for an additional one-level reduction if available under that

3  section.

4          d)    Except for criminal tax violations (including

5  conspiracy to commit such violations chargeable under 18 U.S.C.

6  § 371), not further criminally prosecute defendant for violations

7  arising out of defendant's conduct described in the agreed-to

8  factual basis set forth in paragraph 19 below.  Defendant

9  understands that the USAO is free to criminally prosecute defendant

10 for any other unlawful past conduct or any unlawful conduct that

11 occurs after the date of this agreement.  Defendant agrees that at

12 the time of sentencing the Court may consider the uncharged conduct

13 in determining the applicable Sentencing Guidelines range, the

14 propriety and extent of any departure from that range, and the

15 sentence to be imposed after consideration of the Sentencing

16 Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

17         7.    The USAO further agrees:

18         a)    Not to offer as evidence in its case-in-chief in the

19 above-captioned case or any other criminal prosecution that may be

20 brought against defendant by the USAO, or in connection with any

21 sentencing proceeding in any criminal case that may be brought

22 against defendant by the USAO, any Cooperation Information.

23 Defendant agrees, however, that the USAO may use both Cooperation

24 Information and Plea Information:  (1) to obtain and pursue leads to

25 other evidence, which evidence may be used for any purpose,

26 including any criminal prosecution of defendant; (2) to cross-

27 examine defendant should defendant testify, or to rebut any evidence

28 offered, or argument or representation made, by defendant,

5

1   defendant's counsel, or a witness called by defendant in any trial,

2   sentencing hearing, or other court proceeding; and (3) in any

3   criminal prosecution of defendant for false statement, obstruction

4   of justice, or perjury.

5          b)   Not to use Cooperation Information against defendant

6   at sentencing for the purpose of determining the applicable

7   guideline range, including the appropriateness of an upward

8   departure, or the sentence to be imposed, and to recommend to the

9   Court that Cooperation Information not be used in determining the

10  applicable guideline range or the sentence to be imposed.  Defendant

11  understands, however, that Cooperation Information will be disclosed

12  to the probation office and the Court, and that the Court may use

13  Cooperation Information for the purposes set forth in U.S.S.G

14  § 1B1.8(b) and for determining the sentence to be imposed.

15         c)   In connection with defendant's sentencing, to bring

16  to the Court's attention the nature and extent of defendant's

17  cooperation.

18         d)   If the USAO determines, in its exclusive judgment,

19  that defendant has both complied with defendant's obligations under

20  paragraphs 2 through 4 above and provided substantial assistance to

21  law enforcement in the prosecution or investigation of another

22  ("substantial assistance"), to move the Court pursuant to U.S.S.G.

23  § 5K1.1, to fix an offense level and corresponding guideline range

24  below that otherwise dictated by the sentencing guidelines, and to

25  recommend a term of imprisonment within this reduced range.

26  //

27  //

28  //

6

1                    DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION

2        8.   Defendant understands the following:

3        a)   Any knowingly false or misleading statement by

4   defendant will subject defendant to prosecution for false statement,

5   obstruction of justice, and perjury and will constitute a breach by

6   defendant of this agreement.

7        b)   Nothing in this agreement requires the USAO or any

8   other prosecuting, enforcement, administrative, or regulatory

9   authority to accept any cooperation or assistance that defendant may

10  offer, or to use it in any particular way.

11       c)   Defendant cannot withdraw defendant's guilty plea if

12  the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a

13  reduced guideline range or if the USAO makes such a motion and the

14  Court does not grant it or if the Court grants such a USAO motion

15  but elects to sentence above the reduced range.

16       d)   At this time the USAO makes no agreement or

17  representation as to whether any cooperation that defendant has

18  provided or intends to provide constitutes or will constitute

19  substantial assistance.  The decision whether defendant has provided

20  substantial assistance will rest solely within the exclusive

21  judgment of the USAO.

22       e)   The USAO's determination whether defendant has

23  provided substantial assistance will not depend in any way on

24  whether the government prevails at any trial or court hearing in

25  which defendant testifies or in which the government otherwise

26  presents information resulting from defendant's cooperation.

27

28

## NATURE OF THE OFFENSE

9.   Defendant understands that for defendant to be guilty of the crime charged in count one of the Information, that is, Conspiracy, in violation of Title 18, United States Code, Section 371, the following must be true:   (1) Beginning in or around 1999 and continuing through in or around October 2013, there was an agreement between two or more persons to commit a violation of Title 18, United States Code, Sections 1341 and 1346 (Mail Fraud and Honest Services Mail Fraud); Title 18, United States Code, Section 1952(a)(3) (Interstate Travel in Aid of a Racketeering Enterprise); Title 18, United States Code, Section 1957 (Monetary Transactions in Property Derived from Specified Unlawful Activity); and Title 42, United States Code, Section 1320a-7b(b)(2)(A) (Payment or Receipt of Kickbacks in Connection with a Federal Health Care Program); (2) defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

10.   Defendant understands that Mail Fraud, in violation of Title 18, United States Code, Section 1341, has the following elements:   (1) the defendant knowingly devised or participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises; (2) the statements made or facts omitted as part of the scheme were material, that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) the defendant acted with the intent to defraud; and (4) the defendant used, or caused to be

8

1  used, the mails to carry out or attempt to carry out an essential
2  part of the scheme.  Defendant further understands that Honest
3  Services Mail Fraud, in violation of Title 18, United States Code,
4  Section 1346, has the following elements:  (1) the defendant devised
5  or participated in a scheme or plan to deprive a patient of his or
6  her right to honest services; (2) the scheme or plan consisted of a
7  bribe or kickback in exchange for medical services; (3) a medical
8  professional person owed a fiduciary duty to the patient; (4) the
9  defendant acted with the intent to defraud by depriving the patient
10 of his or her right of honest services; (5) the defendant's act was
11 material, that is, it had a natural tendency to influence, or was
12 capable of influencing, a person's acts; and (6) the defendant used,
13 or caused someone to use, the mails to carry out or attempt to carry
14 out the scheme or plan.

15      11.  Defendant understands that Interstate Travel in Aid of a
16 Racketeering Enterprise, in violation of Title 18, United States
17 Code, Section 1952(a)(3), has the following elements:  (1) defendant
18 used the mail or a facility of interstate commerce with the intent
19 to promote, manage, establish, or carry on, or facilitate the
20 promotion, management, establishment, or carrying on, of unlawful
21 activity, specifically payment and receipt of kickbacks in violation
22 of California Business & Professions Code § 650, California
23 Insurance Code § 750, and California Labor Code § 3215; and (2)
24 after doing so, defendant performed or attempted to perform an act
25 to promote, manage, establish, or carry on, or facilitate the
26 promotion, management, establishment, or carrying on, of such
27 unlawful activity.

28

9

12.   Defendant understands that Money Laundering, in violation of Title 18, United States Code, Section 1957, has the following elements:   (1) the defendant knowingly engaged or attempted to engage in a monetary transaction; (2) the defendant knew the transaction involved criminally derived property; (3) the property had a value greater than $10,000; (4) the property was, in fact, derived from mail fraud; and (5) the transaction occurred in the United States.

13.   Defendant understands that Payment of Kickbacks in Connection with a Federal Health Care Program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), has the following elements:   (1) defendant knowingly and wilfully paid remuneration, directly or indirectly, in cash or in kind, to another person; (2) the remuneration was given to induce that person to refer an individual for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program; and (3) defendant knew that such payment of remuneration was illegal.

<u>PENALTIES AND RESTITUTION</u>

14.   Defendant understands that the total statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371, is:   5 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

15.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.   Defendant

10

understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

16.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the court accepts defendant's guilty plea, it will be a federal felony for defendant to possess a firearm or ammunition.   Defendant understands that the convictions in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.   Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

17.   Defendant understands that, if defendant is not a United States citizen, the felony convictions in this case may subject defendant to:   removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future.   The court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony convictions in this case.   Defendant understands that unexpected

11

1   immigration consequences will not serve as grounds to withdraw

2   defendant's guilty plea.

3       18.   Defendant understands that defendant will be required to

4   pay full restitution to the victims of the offense to which

5   defendant is pleading guilty.  Defendant agrees that, in return for

6   the USAO's compliance with its obligations under this agreement, the

7   Court may order restitution to persons other than the victims of the

8   offense to which defendant is pleading guilty and in amounts greater

9   than those alleged in the count to which defendant is pleading

10  guilty.  In particular, defendant agrees that the Court may order

11  restitution to any victim of any of the following for any losses

12  suffered by that victim as a result:   (a) any relevant conduct, as

13  defined in U.S.S.G. § 1B1.3, in connection with the offense to which

14  defendant is pleading guilty; and (b) any charges not prosecuted

15  pursuant to this agreement as well as all relevant conduct, as

16  defined in U.S.S.G. § 1B1.3, in connection with those counts and

17  charges.  The parties have not come to an agreement on the amount of

18  restitution.

19                          FACTUAL BASIS

20      19.  Defendant admits that defendant is, in fact, guilty of the

21  offense to which defendant is agreeing to plead guilty.  Defendant

22  and the USAO agree to the statement of facts provided below and

23  agree that this statement of facts is sufficient to support a plea

24  of guilty to the charges described in this agreement and to

25  establish the Sentencing Guidelines factors set forth in paragraph

26  21 below, but is not meant to be a complete recitation of all facts

27  relevant to the underlying criminal conduct or all facts known to

28  either party that relate to that conduct.

                                12

1   Healthsmart Pacific Inc., doing business as Pacific Hospital of

2   Long Beach ("Pacific Hospital") was a hospital located in Long

3   Beach, California, specializing in surgeries, particularly spinal

4   and orthopedic surgeries.  From at least in or around 1997 to

5   October 2013, Pacific Hospital was owned and/or operated by Michael

6   D. Drobot and Co-Conspirator A.  From 1999 to at least October 2013,

7   defendant was the Chief Financial Officer of Pacific Hospital, and

8   was responsible for overseeing its financial affairs, including the

9   collection of payments from workers' compensation insurance carriers

10  and other health insurance carriers, as well as the issuance of

11  payments to vendors and others for goods and services.

12      Beginning in or around 1999 and continuing to in or around

13  October 2013, in Orange and Los Angeles Counties, within the Central

14  District of California, and elsewhere, defendant CANEDO, together

15  with other co-conspirators known and unknown to the United States

16  Attorney, knowingly combined, conspired, and agreed to commit the

17  following offenses against the United States:  Mail Fraud and Honest

18  Services Mail Fraud, in violation of Title 18, United States Code,

19  Sections 1341 and 1346; Interstate Travel in Aid of a Racketeering

20  Enterprise, in violation of Title 18, United States Code, Section

21  1952(a)(3); Monetary Transactions in Property Derived from Specified

22  Unlawful Activity, in violation of Title 18, United States Code,

23  Section 1957; and Payment or Receipt of Kickbacks in Connection with

24  a Federal Health Care Program, in violation of Title 42, United

25  States Code, Section 1320a-7b(b)(2)(A).

26      Specifically, beginning in or around 1999 and continuing

27  through in or around October 2013, defendant conspired with Drobot,

28  Co-Conspirator A, other hospital employees, and dozens of doctors,

13

chiropractors, marketers, and others to pay kickbacks in return for
the referral of thousands of patients to Pacific Hospital for spinal
surgeries and other medical services paid for primarily through the
California Workers' Compensation System ("CWCS"), and by 2004
through the Federal Employees' Compensation Act ("FECA") as well.
To channel the kickback payments, the co-conspirators used Drobot's
company Pacific Specialty Physician Management, Inc. ("PSPM").  In
addition, as defendant learned in or about 2008, to help generate
the monies for the kickback payments, the co-conspirators used a co-
schemer's company or Drobot's own company International Implants
("I2"), located in Newport Beach, California, to fraudulently
inflate the price of medical hardware purchased by Pacific Hospital
to be used in the spinal surgeries; defendant and his co-
conspirators knew that, under California law, medical hardware was
considered a "pass-through" cost that could be billed at no more
than $250 over what Pacific Hospital paid for the hardware.  In
paying the kickbacks, inflating the medical hardware costs, and
submitting the resulting claims for spinal surgeries and medical
services, defendant and his co-conspirators acted with the intent to
defraud workers' compensation insurance carriers and to deprive the
patients of their right of honest services.

        The hospital kickback scheme operated as follows:  defendant's
co-conspirators offered to pay kickbacks to doctors, chiropractors,
marketers, and others (the "kickback recipients") in return for
their referring workers' compensation patients to Pacific Hospital
for spinal surgeries, other types of surgeries, toxicology, and
other services, to be paid through FECA and the CWCS.  For spinal
surgeries, typically, the co-conspirators offered to pay a kickback

of $15,000 per lumbar fusion surgery and a lower amount per cervical
fusion surgery provided that the surgeon used in the surgery
hardware supplied by a specified distributor.  Beginning in
approximately 2008, Drobot's company I2 was typically the
distributor.

Influenced by the promise of kickbacks, kickback recipients
referred patients insured through the CWCS and the FECA to Pacific
Hospital for spinal surgeries, other types of surgeries, and other
medical services.  In some cases, the patients lived dozens or
hundreds of miles from Pacific Hospital, and closer to other
qualified medical facilities.  The workers' compensation patients
were not informed that the medical professionals had been offered
kickbacks to induce them to refer the surgeries to Pacific Hospital.

Pursuant to the kickback agreements, kickback recipients
referred patients to Pacific Hospital.  In the case of spinal
surgeries, as part of the kickback agreements, surgeons usually used
I2 as the distributor.  Typically, for surgeries covered by the
CWCS, the price I2 charged for the hardware was inflated by a
multiple of the price at which I2 had purchased the device from the
manufacturer.

Pacific Hospital submitted claims, by mail and electronically,
to workers' compensation insurance carriers for payment for the
surgeries and other medical services.  For a spinal surgery, Pacific
Hospital typically submitted a claim for the hospital's services and
the medical hardware used in the surgery.  For surgeries covered by
the CWCS, Pacific Hospital submitted the inflated invoice for the
hardware from I2, plus an additional $250.  Thus, the purported
"pass-through" cost submitted in the claims for medical hardware was

15

thousands of dollars -- and sometimes tens of thousands of dollars --- higher than what the manufacturer actually charged and what I2 actually paid for the hardware.

As defendant and his co-conspirators knew, federal and California law prohibited paying or receiving the aforementioned kickbacks for the referral of patients for medical services. Defendant and his co-conspirators also knew that the insurance carriers would be unwilling to pay claims for medical services that were obtained through such illegal kickbacks. Moreover, defendant and his co-conspirators knew that the insurance carriers would be unwilling to pay claims for spinal surgery hardware that were artificially inflated and substantially above the manufacturer's price. However, defendant's co-conspirators deliberately did not disclose to the insurance carriers the kickbacks, the inflation of the medical hardware, or the fact that I2 was owned and controlled by Drobot and was not a manufacturer of such hardware. Rather, at some point, defendant's co-conspirators included on I2's invoices stamps falsely stating that I2 was an "FDA Registered Manufacturer."

Further, to conceal the illegal kickback payments from the workers' compensation insurance carriers and patients, defendant's co-conspirators entered into bogus contracts with the kickback recipients under which the kickback recipients purported to provide services to Drobot's companies to justify the kickback payments. The services and other items of value discussed in those contracts were, in fact, generally not provided to Pacific Hospital or were provided at highly inflated prices. The compensation to the kickback recipients was actually based on the number and type of surgeries they referred to the hospital. These contracts included,

among others, the following:  collection agreements, option
agreements, research and development agreements, lease and rental
agreements, consulting agreements, marketing agreements, and
management agreements.

For example, the collection agreements provided that doctors
who signed them would assist Pacific Hospital in collecting its fees
for spinal surgeries from insurance carriers, and that in return
Pacific Hospital would pay the doctors a percentage of the total
amount collected, often fifteen percent.  In reality, however, the
collection was done by Pacific Hospital staff under defendant's
supervision, without assistance from the doctors.  The payments to
the doctors were thus purely a reward for referrals.  Defendant
often had to inform the doctors of the status of the hospital's
collections, so that they would know when and how much they would be
paid for their referrals.  Moreover, defendant and others expressly
told doctors that they would be paid under the collection agreements
only for surgeries or other services that those doctors had referred
to Pacific Hospital; in some cases, defendant had to mediate among
different doctors who claimed a right to receive kickback payments
for the referral of the same patient and surgery.

Similarly, the collection agreement that Pacific Hospital
signed with Marketer A's company provided that Marketer A would
assist Pacific Hospital in collecting its fees for spinal surgeries
and other services from the Department of Labor under the FECA, and
that in return Pacific Hospital would pay Marketer A's company a
percentage of the total amount collected, which ranged from 25 to 30
percent; the payment amount was later changed to a flat monthly fee
of from $55,000 to $75,000 per month.  In reality, however, the

17

collection was often done primarily by Pacific Hospital staff under defendant's supervision, with Marketer A's company providing little assistance.   In some cases, Marketer A's company provided more extensive collection services.   In all cases, the payments that Pacific Hospital made to Marketer A's company were far above the fair market value of the services provided.   The payments to Marketer A were thus primarily a reward for Marketer A's referral of patients to Pacific Hospital.

Defendant and his co-conspirators kept records of the number of surgeries and other medical services performed at Pacific Hospital due to referrals from kickback recipients, the amounts collected from insurance carriers for those services, and the amounts paid to kickback recipients for those referrals.   Periodically, defendant's co-conspirators amended the bogus contracts with the kickback recipients to increase or decrease the amount of agreed compensation described in the contracts, in order to match the amount of kickbacks paid or promised in return for referrals.

From in or around 2008 to in or around April 2013, Pacific Hospital billed workers' compensation insurance carriers approximately $500 million in claims for several thousand spinal surgeries that were the result of the payment of kickbacks; and defendant and other co-conspirators paid kickback recipients between approximately $20 million and $50 million in kickbacks relating to those claims.

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendant and other co-conspirators committed various overt acts within the Central District of California, including but not limited to the following:

1    Overt Act No. 1

2    On or about November 10, 2009, defendant caused a check in the

3    amount of $43,650.00 from SCIF to be sent by mail to Pacific

4    Hospital in reimbursement for a claim for spine surgery on Patient A

5    performed by Surgeon A, which claim was induced by the payment of a

6    kickback to Chiropractor A.

7    Overt Act No. 2

8    On or about April 14, 2010, defendant caused a check in the

9    amount of $90,467.80 from SCIF to be sent by mail to Pacific

10   Hospital in reimbursement for a claim for spine surgery on Patient B

11   performed by Surgeon B, which claim was induced by the payment of a

12   kickback to Surgeon C.

13   Overt Act No. 3

14   On or about March 31, 2011, defendant caused a check in the

15   amount of $23,531.23 from Vanliner to be sent by mail to Pacific

16   Hospital in reimbursement for a claim for spine surgery on Patient C

17   performed by Surgeon D, which claim was induced by the payment of a

18   kickback to Surgeon D.

19   Overt Act No. 4

20   On or about June 29, 2012, defendant caused a kickback in the

21   amount of $100,000 to be paid to Surgeon D for the referral of

22   lumbar and cervical spinal surgeries performed at Pacific Hospital,

23   including on patients covered by the FECA.

24   Overt Act No. 5

25   On or about January 18, 2013, defendant caused a check in the

26   amount of $51,115.44 from Traveler's Insurance to be sent by mail to

27   Pacific Hospital in reimbursement for a claim for spine surgery on

28

19

1  Patient D performed by Surgeon E, which claim was induced by the
2  payment of a kickback to Surgeon E.

3      Overt Act No. 6

4      On or about January 24, 2013, defendant caused a check in the
5  amount of $117,142.36 from Vanliner to be sent by mail to Pacific
6  Hospital in reimbursement for a claim for spine surgery on Patient E
7  performed by Surgeon F, which claim was induced by the payment of a
8  kickback to Surgeon F.

9      Overt Act No. 7

10     On or about April 24, 2013, defendant caused a check in the
11 amount of $24,209.90 from ICW to be sent by mail to Pacific Hospital
12 in reimbursement for a claim for spine surgery on Patient F
13 performed by Surgeon G, which claim was induced by the payment of a
14 kickback to Surgeon G.

15     Overt Act No. 8

16     On or about November 27, 2013, defendant caused a check in the
17 amount of $50,903.76 from Traveler's Insurance to be sent by mail to
18 Pacific Hospital in reimbursement for a claim for spine surgery on
19 Patient G performed by Surgeon G, which claim resulted from the
20 payment of a kickback to Chiropractor B.

21               SENTENCING FACTORS

22     20.  Defendant understands that in determining defendant's
23 sentence the Court is required to calculate the applicable
24 Sentencing Guidelines range and to consider that range, possible
25 departures under the Sentencing Guidelines, and the other sentencing
26 factors set forth in 18 U.S.C. § 3553(a).  Defendant understands
27 that the Sentencing Guidelines are advisory only, that defendant
28 cannot have any expectation of receiving a sentence within the

1  calculated Sentencing Guidelines range, and that after considering
2  the Sentencing Guidelines and the other § 3553(a) factors, the Court
3  will be free to exercise its discretion to impose any sentence it
4  finds appropriate up to the maximum set by statute for the crimes of
5  conviction.
6       21.  Defendant and the USAO agree to the following applicable
7  Sentencing Guidelines factors:

8       Base Offense Level:      6  [U.S.S.G. § 2B1.1(a)(2)]

9       Specific Offense
        Characteristics
10

11      Loss between
        $20M to $50M:          +22  [U.S.S.G. § 2B1.1(b)(1)(L)]

12      More than 50 victims:   +4  [U.S.S.G. § 2B1.1(b)(2)(B)]

13      Federal health care
        offense with gov't
14      program loss of
        between $1M-$7M:        +2  [U.S.S.G. § 2B1.1(b)(7)]
15

16      Adjustments

17      Acceptance of
        Responsibility:         -3  [U.S.S.G. § 3E1.1]
18

19      Total:                  31

20  The USAO will agree to a two-level downward adjustment for
21  acceptance of responsibility (and, if applicable, move for an
22  additional one-level downward adjustment under U.S.S.G. § 3E1.1(b))
23  only if the conditions set forth in paragraph 6(c)) are met.
24  Subject to paragraph 7 above and paragraph 33 below, defendant and
25  the USAO agree not to seek, argue, or suggest in any way, either
26  orally or in writing, that any other specific offense
27  characteristics, adjustments, or departures relating to the offense
28  level be imposed.  Defendant agrees, however, that if, after signing

21

1  this agreement but prior to sentencing, defendant were to commit an
2  act, or the USAO were to discover a previously undiscovered act
3  committed by defendant prior to signing this agreement, which act,
4  in the judgment of the USAO, constituted obstruction of justice
5  within the meaning of U.S.S.G. § 3C1.1, the USAO would be free to
6  seek the enhancement set forth in that section.

7      22.  Defendant understands that there is no agreement as to
8  defendant's criminal history or criminal history category.

9      23.  Defendant and the USAO reserve the right to argue for a
10 sentence outside the sentencing range established by the Sentencing
11 Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),
12 (a)(2), (a)(3), (a)(6), and (a)(7).

13              <u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

14     24.  Defendant understands that by pleading guilty, defendant
15 gives up the following rights:

16          a)   The right to persist in a plea of not guilty.

17          b)   The right to a speedy and public trial by jury.

18          c)   The right to be represented by counsel – and if
19 necessary have the court appoint counsel – at trial.  Defendant
20 understands, however, that, defendant retains the right to be
21 represented by counsel – and if necessary have the court appoint
22 counsel – at every other stage of the proceeding.

23          d)   The right to be presumed innocent and to have the
24 burden of proof placed on the government to prove defendant guilty
25 beyond a reasonable doubt.

26          e)   The right to confront and cross-examine witnesses
27 against defendant.

28

1    f) The right to testify and to present evidence in

2 opposition to the charges, including the right to compel the

3 attendance of witnesses to testify.

4    g) The right not to be compelled to testify, and, if

5 defendant chose not to testify or present evidence, to have that

6 choice not be used against defendant.

7    h) Any and all rights to pursue any affirmative

8 defenses, Fourth Amendment or Fifth Amendment claims, and other

9 pretrial motions that have been filed or could be filed.

10        WAIVER OF APPEAL OF CONVICTION

11  25. Defendant understands that, with the exception of an

12 appeal based on a claim that defendant's guilty plea was

13 involuntary, by pleading guilty defendant is waiving and giving up

14 any right to appeal defendant's convictions on the offense to which

15 defendant is pleading guilty.

16    LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

17  26. Defendant agrees that, provided the Court imposes a total

18 term of imprisonment on the single count of conviction of no more

19 than the statutory maximum, defendant gives up the right to appeal

20 all of the following: (a) the procedures and calculations used to

21 determine and impose any portion of the sentence; (b) the term of

22 imprisonment imposed by the Court, provided it is within the

23 statutory maximum; (c) the fine imposed by the court, provided it is

24 within the statutory maximum; (d) the amount and terms of any

25 restitution order, provided it requires payment of no more than

26 $20,000,000; (e) the term of probation or supervised release imposed

27 by the Court, provided it is within the statutory maximum; and

28 (f) any of the following conditions of probation or supervised

release imposed by the Court: the conditions set forth in General Orders 318, 01-05, and/or 05-02 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

27. The USAO agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment of no less than the statutory maximum, the USAO gives up its right to appeal any portion of the sentence, with the exception that the USAO reserves the right to appeal the following: the amount of restitution ordered, if that amount is less than $20,000,000.

## RESULT OF WITHDRAWAL OF GUILTY PLEA

28. Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement, including in particular its obligations regarding the use of Cooperation Information; (b) in any investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence derived from any Cooperation Information shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, or any federal rule, that any Cooperation Information or any evidence derived from any Cooperation Information should be suppressed or is inadmissible; and (c) should the USAO

24

choose to pursue any charge that was not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<u>EFFECTIVE DATE OF AGREEMENT</u>

29.   This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

<u>BREACH OF AGREEMENT</u>

30.   Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.   For example, if defendant knowingly, in an interview, before a grand jury, or at trial, falsely accuses another person of criminal conduct or falsely minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement.   All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.   If the USAO declares this

1   agreement breached, and the Court finds such a breach to have

2   occurred, then:

3          a)   If defendant has previously entered a guilty plea

4   pursuant to this agreement, defendant will not be able to withdraw

5   the guilty plea.

6          b)   The USAO will be relieved of all its obligations

7   under this agreement; in particular, the USAO: (i) will no longer be

8   bound by any agreements concerning sentencing and will be free to

9   seek any sentence up to the statutory maximum for the crime to which

10  defendant has pleaded guilty; (ii) will no longer be bound by any

11  agreements regarding criminal prosecution, and will be free to

12  criminally prosecute defendant for any crime, including charges that

13  the USAO would otherwise have been obligated not to criminally

14  prosecute pursuant to this agreement; and (iii) will no longer be

15  bound by any agreement regarding the use of Cooperation Information

16  and will be free to use any Cooperation Information in any way in

17  any investigation, criminal prosecution, or civil, administrative,

18  or regulatory action by the United States.

19         c)   The USAO will be free to criminally prosecute

20  defendant for false statement, obstruction of justice, and perjury

21  based on any knowingly false or misleading statement by defendant.

22         d)   In any investigation, criminal prosecution, or civil,

23  administrative, or regulatory action by the United States:

24  (i) defendant will not assert, and hereby waives and gives up, any

25  claim that any Cooperation Information was obtained in violation of

26  the Fifth Amendment privilege against compelled self-incrimination;

27  and (ii) defendant agrees that any Cooperation Information and any

28  Plea Information, as well as any evidence derived from any

Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

31. Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was not filed as a result of this agreement, then:

a)    Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b)    Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## COURT AND PROBATION OFFICE NOT PARTIES

32. Defendant understands that the Court and the United States Probation Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

33. Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing

1   Guidelines calculations and determination of sentence, and (c) argue
2   on appeal and collateral review that the Court's Sentencing
3   Guidelines calculations and the sentence it chooses to impose are
4   not error, although each party agrees to maintain its view that the
5   calculations in paragraph 21 are consistent with the facts of this
6   case.  While this paragraph permits both the USAO and defendant to
7   submit full and complete factual information to the United States
8   Probation Office and the Court, even if that factual information may
9   be viewed as inconsistent with the facts agreed to in this
10  agreement, this paragraph does not affect defendant's and the USAO's
11  obligations not to contest the facts agreed to in this agreement.
12      34.  Defendant understands that even if the Court ignores any
13  sentencing recommendation, finds facts or reaches conclusions
14  different from those agreed to, and/or imposes any sentence up to
15  the maximum established by statute, defendant cannot, for that
16  reason, withdraw defendant's guilty plea, and defendant will remain
17  bound to fulfill all defendant's obligations under this agreement.
18  Defendant understands that no one -- not the prosecutor, defendant's
19  attorney, or the Court -- can make a binding prediction or promise
20  regarding the sentence defendant will receive, except that it will
21  be within the statutory maximum.

22                      NO ADDITIONAL AGREEMENTS
23      35.  Defendant understands that, except as set forth herein,
24  there are no promises, understandings, or agreements between the
25  USAO and defendant or defendant's attorney, and that no additional
26  promise, understanding, or agreement may be entered into unless in a
27  writing signed by all parties or on the record in court.
28

1      PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2          36.  The parties agree that this agreement will be considered

3   part of the record of defendant's guilty plea hearing as if the

4   entire agreement had been read into the record of the proceeding.

5   AGREED AND ACCEPTED

6   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF CALIFORNIA
7
    EILEEN M. DECKER
8   United States Attorney

9                                          7/17/15
10  _____            _____
    JOSHUA M. ROBBINS                      Date
11  Assistant United States Attorney

12                                         7/16/15
    _____           _____
13  JAMES L. CANEDO                        Date
    Defendant
14
                                           7/17/15
15  _____            _____
    ANTHONY PACHECO                        Date
16  Attorney for Defendant
    James L. Canedo

17

18

19

20

21

22

23

24

25

26

27

28

                        29

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorneys. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorneys, and my attorneys have advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorneys in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____     _____
JAMES L. CANEDO                      Date 7/16/15
Defendant

30

<u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

I am James L. Canedo's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of guilty plea pursuant to this agreement.

_____          _____
ANTHONY PACHECO                           Date   7/17/15
Attorney for Defendant
James L. Canedo

31

©COPY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 15- |
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 371: Conspiracy] |
| JAMES L. CANEDO, | |
| Defendant. | |

The United States Attorney charges:

[18 U.S.C. § 371]

A.   INTRODUCTORY ALLEGATIONS

At all times relevant to this Information:

1.   Healthsmart Pacific Inc., doing business as Pacific Hospital of Long Beach ("Pacific Hospital"), was a hospital located in Long Beach, California, specializing in surgeries, particularly spinal and orthopedic surgeries.  From at least in or around 1997 to October 2013, Pacific Hospital was owned and/or operated by Michael D. Drobot and Co-Conspirator A.



EXHIBIT
A

1  From 1999 to at least October 2013, defendant JAMES L. CANEDO

2  was the Chief Financial Officer of Pacific Hospital.

3      2.    International Implants LLC ("I2") was a limited

4  liability company owned and operated by Drobot, that was located

5  in Newport Beach, California.  I2 purchased implantable medical

6  devices ("hardware") for use in spinal surgeries from original

7  manufacturers and sold them to hospitals, particularly Pacific

8  Hospital.  I2 was registered with the United States Food and

9  Drug Administration as a repackager/relabeler, but was not

10 registered as a manufacturer, and in fact did not manufacture

11 medical devices.

12     3.    The California Workers' Compensation System ("CWCS")

13 was a system created by California law to provide insurance

14 covering treatment of injury or illness suffered by individuals

15 in the course of their employment.  Under the CWCS, employers

16 were required to purchase workers' compensation insurance

17 policies from insurance carriers to cover their employees.  When

18 an employee suffered a covered injury or illness and received

19 medical services, the medical service provider submitted a claim

20 for payment to the relevant insurance carrier, which then paid

21 the claim.  Claims were submitted to and paid by the insurance

22 carriers either by mail or electronically.  The CWCS was

23 governed by various California laws and regulations.

24     4.    The California State Compensation Insurance Fund

25 ("SCIF") was a non-profit insurance carrier, created by the

26 California Legislature, which provided workers' compensation

27 insurance to employees in California, including serving as the

28                              2

1  "insurer of last resort" under the CWCS system for employees
2  without any other coverage.

3      5.    California law, including but not limited to the
4  California Business and Professions Code, the California
5  Insurance Code, and the California Labor Code, prohibited the
6  offering, delivering, soliciting, or receiving of anything of
7  value in return for referring a patient for medical services.

8      6.    Before January 2013, California law allowed a hospital
9  to bill the cost of medical hardware separately from the other
10  costs of a surgery, such as the hospital's and surgeon's
11  services, the reimbursement rates of which were set by a fee
12  schedule.  The hardware was considered a "pass-through" cost and
13  billing was limited to $250 over what the hospital paid for the
14  hardware.

15      7.    The Federal Employees' Compensation Act ("FECA")
16  provided benefits to civilian employees of the United States,
17  including United States Postal Service employees, for medical
18  expenses and wage-loss disability due to a traumatic injury or
19  occupational disease sustained while working as a federal
20  employee.  Benefits available to injured employees included
21  rehabilitation, medical, surgical, hospital, pharmaceutical, and
22  supplies for treatment of an injury.  The Department of Labor
23  ("DOL") - Office of Workers' Compensation Programs ("OWCP") was
24  the governmental body responsible for administering the FECA.
25  When a federal employee suffered a covered injury or illness and
26  received medical services, the medical service provider
27  submitted a claim for payment by mail or electronically to

28                                3

1  Affiliated Computer Services ("ACS"), located in London,

2  Kentucky, which was contracted with the DOL to handle such

3  claims.  Upon approval of the claim, ACS sent payment by mail or

4  electronic funds transfer from the U.S. Treasury in

5  Philadelphia, Pennsylvania, to the medical service provider.

6       8.   Federal law prohibited the offering, delivering,

7  soliciting, or receiving of anything of value in return for

8  referring a patient for medical services paid for by a federal

9  health care benefit program.

10  B.   OBJECTS OF THE CONSPIRACY

11       9.   Beginning in or around 1999, and continuing to in or

12  around October 2013, in Orange and Los Angeles Counties, within

13  the Central District of California, and elsewhere, defendant

14  CANEDO, together with others known and unknown to the United

15  States Attorney, combined, conspired, and agreed to knowingly

16  and intentionally commit the following offenses against the

17  United States:

18            a.   Mail Fraud and Honest Services Mail Fraud, in

19  violation of Title 18, United States Code, Sections 1341 and

20  1346;

21            b.   Interstate Travel in Aid of a Racketeering

22  Enterprise, in violation of Title 18, United States Code,

23  Section 1952(a)(3);

24            c.   Monetary Transactions in Property Derived from

25  Specified Unlawful Activity, in violation of Title 18, United

26  States Code, Section 1957; and

27

28
                                    4

1    d.   Payment or Receipt of Kickbacks in Connection

2  with a Federal Health Care Program, in violation of Title 42,

3  United States Code, Section 1320a-7b(b)(2)(A).

4  C.   MANNER AND MEANS OF THE CONSPIRACY

5    10.  The objects of the conspiracy were to be carried out,

6  and were carried out, in substance, as follows:

7    a.   Drobot and other co-conspirators offered to pay

8  kickbacks to doctors, chiropractors, workers' compensation and

9  personal injury attorneys, marketers, and others for their

10  referring workers' compensation patients to Pacific Hospital for

11  spinal surgeries and other medical services, to be paid

12  primarily through the CWCS and the FECA.  For spinal surgeries,

13  typically, Drobot offered to pay a kickback of $15,000 per

14  lumbar fusion surgery and lower amount per cervical fusion

15  surgery.

16    b.   Influenced by the promise of kickbacks, doctors,

17  chiropractors, workers' compensation and personal injury

18  attorneys, marketers, and others referred patients insured

19  through the CWCS and the FECA to Pacific Hospital for spinal

20  surgeries, other types of surgeries, and other medical services.

21  The workers' compensation patients were not informed that the

22  medical professionals had been offered kickbacks to induce them

23  to refer the surgeries and other medical services to Pacific

24  Hospital.

25    c.   The surgeries and other medical services were

26  performed on the referred workers' compensation patients at

27  Pacific Hospital.

28                              5

d.   I2, or another distributor who was a co-
conspirator, purchased medical hardware from a manufacturer and
sold it to Pacific Hospital for use in spinal surgeries.
Typically, the price I2 or the co-conspirator distributor
charged for the hardware was inflated, from four times to as
much as ten times the price at which I2 or the other distributor
had purchased the device from the manufacturer.   On I2's
invoices, I2 included a stamp falsely stating that I2 was an
"FDA Registered Manufacturer."

e.   Pacific Hospital submitted claims, by mail and
electronically, to SCIF and other workers' compensation
insurance carriers for payment of the costs of the surgeries and
other medical services.   Included with the claims for spinal
surgeries were the inflated hardware invoices from I2 or the co-
conspirator distributor.

f.   As defendant CANEDO and the other co-conspirators
knew and intended, and as was reasonably foreseeable to them, in
submitting claims for payment, Pacific Hospital made materially
false and misleading statements to, and concealed material
information from, SCIF and other workers' compensation insurance
carriers, including that: (1) Pacific Hospital did not disclose
to the insurance carriers that it had offered or paid kickbacks
for the referral of the surgeries and other medical services for
which it was submitting claims; and (2) the hardware invoices
were fraudulently inflated.

g.   The insurance carriers paid Pacific Hospital's
claims, by mail or electronically.

h.  Defendant CANEDO and other co-conspirators paid, and caused others to pay kickbacks to the doctors, chiropractors, workers' compensation and personal injury attorneys, marketers, and others who had referred patients to Pacific Hospital for surgeries and other medical services.  The kickback recipients included, among others, various surgeons, other doctors, chiropractors, marketers, and attorneys.

i.  To conceal the nature of the kickback payments from both workers' compensation insurance carriers and patients, Drobot, through one of the companies he owned and/or operated, entered into bogus contracts with the doctors, chiropractors, workers' compensation and personal injury attorneys, marketers, and others.  The services discussed in those contracts were, in fact, generally not provided or were provided at highly inflated prices.  Rather, the compensation paid was based on the number and type of surgeries and other medical services referred to Pacific Hospital.  Drobot and his co-conspirators entered into the following bogus contracts, among others, in order to hide kickback payments:  collection agreements, option agreements, research and development agreements, lease and rental agreements, consulting agreements, marketing agreements, and management agreements.

j.  For example, the collection agreements provided that doctors who signed them would assist Pacific Hospital in collecting its fees for spinal surgeries from insurance carriers, and that in return Pacific Hospital would pay the doctors a percentage of the total amount collected, often

7

1    fifteen percent.  In reality, however, the collection was done

2    by Pacific Hospital staff under defendant CANEDO's supervision,

3    without assistance from the doctors.  The payments to the

4    doctors were thus purely a reward for referrals.  Defendant

5    CANEDO often had to inform the doctors of the status of the

6    hospital's collections, so that they would know when and how

7    much they would be paid for their referrals.  Moreover,

8    defendant CANEDO and others expressly told doctors that they

9    would be paid under the collection agreements only for surgeries

10   or other services that those doctors had referred to Pacific

11   Hospital; in some cases, defendant CANEDO had to mediate among

12   different doctors who claimed a right to receive kickback

13   payments for the referral of the same patient and surgery.

14         k.   Similarly, the collection agreement that Pacific

15   Hospital signed with Marketer A's company provided that Marketer

16   A would assist Pacific Hospital in collecting its fees for

17   spinal surgeries and other services from the Department of Labor

18   under the FECA, and that in return Pacific Hospital would pay

19   Marketer A's company a percentage of the total amount collected,

20   which ranged from 25 to 30 percent; the payment amount was later

21   changed to a flat monthly fee of from $55,000 to $75,000 per

22   month.  In reality, however, the collection was often done

23   primarily by Pacific Hospital staff under defendant CANEDO's

24   supervision, with Marketer A's company providing little

25   assistance.  In some cases, Marketer A's company provided more

26   extensive collection services.  In all cases, the payments that

27   Pacific Hospital made to Marketer A's company were far above the

28                                8

1   fair market value of the services provided.   The payments to

2   Marketer A were thus primarily a reward for Marketer A's

3   referral of patients to Pacific Hospital.

4          1.   Defendant CANEDO and other co-conspirators kept

5   records of the number of surgeries and other medical services

6   performed at Pacific Hospital due to referrals from the kickback

7   recipients, as well amounts paid to the kickback recipients for

8   those referrals.   Periodically, Drobot and other co-conspirators

9   amended the bogus contracts with the kickback recipients to

10  increase or decrease the amount of agreed compensation described

11  in the contracts, in order to match the amount of kickbacks paid

12  or promised in return for referrals.

13  D.   EFFECTS OF THE CONSPIRACY

14         11.   Had SCIF and the other workers' compensation insurance

15  carriers known the true facts regarding (1) the payment of

16  kickbacks for the referral of workers' compensation patients for

17  surgeries and other medical services performed at Pacific

18  Hospital and (2) the fraudulent inflation of the cost of medical

19  hardware used in spinal surgeries, they would not have paid the

20  claims or would have paid a lesser amount.

21         12.   From in or around 2008 to in or around April 2013,

22  Pacific Hospital billed workers' compensation insurance carriers

23  approximately $500 million in claims for spinal surgeries that

24  were the result of the payment of a kickback, and defendant

25  CANEDO and other co-conspirators paid kickback recipients

26  between approximately $20 million and $50 million in kickbacks

27  relating to those claims.

28
                                        9

1   E.    OVERT ACTS

2        13.   In furtherance of the conspiracy, and to accomplish

3   its objects, defendant CANEDO, together with others known and

4   unknown to the United States Attorney, committed the following

5   overt acts, among others, within the Central District of

6   California, and elsewhere:

7        Overt Act No. 1:  On or about November 10, 2009, defendant

8   CANEDO caused a check in the amount of $43,650.00 from SCIF to

9   be sent by mail to Pacific Hospital in reimbursement for a claim

10  for spine surgery on Patient A performed by Surgeon A, which

11  claim was induced by the payment of a kickback to Chiropractor

12  A.

13       Overt Act No. 2:  On or about April 14, 2010, defendant

14  CANEDO caused a check in the amount of $90,467.80 from SCIF to

15  be sent by mail to Pacific Hospital in reimbursement for a claim

16  for spine surgery on Patient B performed by Surgeon B, which

17  claim was induced by the payment of a kickback to Surgeon C.

18       Overt Act No. 3:  On or about March 31, 2011, defendant

19  CANEDO caused a check in the amount of $23,531.23 from Vanliner

20  to be sent by mail to Pacific Hospital in reimbursement for a

21  claim for spine surgery on Patient C performed by Surgeon D,

22  which claim was induced by the payment of a kickback to Surgeon

23  D.

24       Overt Act No. 4:  On or about June 29, 2012, defendant

25  CANEDO caused a kickback in the amount of $100,000 to be paid to

26  Surgeon D for the referral of lumbar and cervical spinal

27

28                                   10

1   surgeries performed at Pacific Hospital, including on patients
2   covered by the FECA.

3       Overt Act No. 5:  On or about January 18, 2013, defendant
4   CANEDO caused a check in the amount of $51,115.44 from
5   Traveler's Insurance to be sent by mail to Pacific Hospital in
6   reimbursement for a claim for spine surgery on Patient D
7   performed by Surgeon E, which claim was induced by the payment
8   of a kickback to Surgeon E.

9       Overt Act No. 6:  On or about January 24, 2013, defendant
10  CANEDO caused a check in the amount of $117,142.36 from Vanliner
11  to be sent by mail to Pacific Hospital in reimbursement for a
12  claim for spine surgery on Patient E performed by Surgeon F,
13  which claim was induced by the payment of a kickback to Surgeon
14  F.

15      Overt Act No. 7:  On or about April 24, 2013, defendant
16  CANEDO caused a check in the amount of $24,209.90 from ICW to be
17  sent by mail to Pacific Hospital in reimbursement for a claim
18  for spine surgery on Patient F performed by Surgeon G, which
19  claim was induced by the payment of a kickback to Surgeon G.

20      Overt Act No. 8:  On or about November 27, 2013, defendant
21  CANEDO caused a check in the amount of $50,903.76 from
22  Traveler's Insurance to be sent by mail to Pacific Hospital in
23  ///
24  ///
25
26
27
28
                          11

1  reimbursement for a claim for spine surgery on Patient G

2  performed by Surgeon G, which claim resulted from the payment of

3  a kickback to Chiropractor B.

4

5                                EILEEN M. DECKER
                                United States Attorney

6

7                                ROBERT E. DUGDALE
                                Assistant United States Attorney

8                                Chief, Criminal Division

9                                DENNISE D. WILLETT
                                Assistant United States Attorney

10                               Chief, Santa Ana Branch Office

11                               JOSHUA M. ROBBINS
                                Assistant United States Attorney

12

13                               SCOTT D. TENLEY
                                Assistant United States Attorney

14                               ASHWIN JANAKIRAM
                                Special Assistant United States

15                               Attorney

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        12